UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FAIRBANKS CAPITAL CORP.,<br>a Utah corporation, FAIRBANKS CAPITAL<br>HOLDING CORP., a Delaware corporation,<br>and THOMAS D. BASMAJIAN,<br><br>Defendants. | Civil Action No. 03-12219-DPW |
| ALANNA L. CURRY, et al.,<br>individually and on behalf of all others<br>similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FAIRBANKS CAPITAL CORP.,<br>a Utah corporation, Defendant. | Civil Action No. 03-10895-DPW |

**FEDERAL TRADE COMMISSION'S MEMORANDUM
REGARDING THE FAIRBANKS SETTLEMENT AND REDRESS PROGRAM**

On May 12, 2004, this Court will consider final approval of the proposed nationwide class action settlement of a case against Fairbanks Capital Corp. ("Fairbanks"). The Court previously entered an order preliminarily approving the Settlement Agreement and Release ("Settlement") and certifying a nationwide class. Under the Settlement terms, and the related settlement in *United States of America v. Fairbanks Capital Corp., et al.*, No. 03-12219-DPW (Exhibit 1) (hereinafter, "FTC Consent Order"), the defendants will provide $40 million in

consumer redress for class members who suffered default-related harm or paid unauthorized prepayment penalties (the "Redress Fund").[1] The Federal Trade Commission ("FTC" or "Commission") will establish and administer a program through which Settlement class members may obtain redress (the "Redress Program"). The FTC Consent Decree provides that the Commission has sole discretion in administering the Redress Program. (FTC Consent Order § XXII). The Commission submits this memorandum for the Court's consideration in connection with final approval of the proposed nationwide class action settlement to (1) provide background information about the FTC's settlement and (2) describe the Redress Program.

## I. BACKGROUND

The FTC is an independent law enforcement agency whose mission is to promote the efficient functioning of the marketplace by protecting consumers from unfair or deceptive acts or practices. The FTC enforces the FTC Act, which prohibits unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce, 15 U.S.C. § 45(a), as well as several statutes governing consumer credit. Pursuant to this authority, the FTC routinely brings enforcement actions to further its mission.

Late last year, the Commission filed a complaint against Fairbanks, its parent company, and its former Chief Executive Officer, Thomas Basmajian, and simultaneously filed settlements with the parties. On November 21, 2003, the Court entered the FTC Consent Order preliminarily approving the FTC's settlement with Fairbanks. The FTC Consent Order will become final only

---

[1] The Redress Fund is separate from the Settlement's "Reverse and Reimburse Program," whereby Fairbanks will provide automatic loan credits or make refunds in order to reverse certain charges on loan accounts. *See infra* note 6. The FTC is not involved in that part of the Settlement.

2

if the Court gives final approval to the Settlement.[2] (FTC Consent Order §§ XVII - XVIII, XXXIII).

Before agreeing to settle, the FTC conducted an extensive investigation of Fairbanks. During the Commission's investigation, the FTC obtained over 150,000 pages of documents from Fairbanks and third parties. The FTC also thoroughly investigated defendants' financial condition and concluded, based on a review of accounting and financial records, that the defendants were unable to pay sufficient redress to fully compensate the injury caused by the alleged illegal practices. Thus, the FTC agreed to a settlement that included significant monetary relief, strong injunctive relief, and additional relief through the proposed class action settlement. Based on an evaluation of the case as well as the defendants' financial condition, the Commission believes that the proposed class action settlement is fair and reasonable.

### A. The FTC's Complaint

The FTC's complaint alleged that Fairbanks had violated the FTC Act by: (1) failing to timely or properly post payments received from borrowers, and then assessing late fees and other charges as a result; (2) imposing casualty insurance on consumers' homes (called "force placed" insurance) when such insurance was already in place; (3) misrepresenting amounts that consumers owed; and (4) misrepresenting that certain fees assessed and collected by Fairbanks were allowed under the mortgage contract and permitted by law. The FTC also alleged violations of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1601-1692, and the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681u. The Department of Housing and Urban Development

---

[2] Although the FTC Consent Order is a preliminary order, its terms provide that Fairbanks is subject to its injunctive relief immediately.

3

joined the complaint to allege violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-2617.

### B.     The FTC Consent Order

The FTC Consent Order contains strong injunctive relief that prohibits Fairbanks from engaging in unfair and deceptive practices and requires significant changes to its business practices to ensure it does not violate the law in the future. For example, it prohibits Fairbanks from charging for force placed insurance before mailing two written notices to the consumer. (FTC Consent Order § II). To address the alleged inadequacies of Fairbanks' dispute resolution procedures, the FTC Consent Order provides that it must maintain and provide adequate staffing for a toll-free phone number (for ten years) and an address specifically dedicated to handling consumers' disputes or questions. (*Id.* § X(A)). The order also provides specific timelines for investigating and responding to consumer disputes. (*Id.* § X(B-D)). It also enjoins Fairbanks from taking any action toward foreclosure until it has (1) reviewed the consumer's loan records to verify that the consumer has failed to make three full monthly payments; (2) confirmed that the consumer has not been subject to any illegal practices (or if such practices have occurred, that it has remedied them); and (3) investigated any consumer disputes. (*Id.* § XII).

Moreover, the FTC Consent Order prohibits charging fees to consumers unless those fees are expressly authorized and not prohibited by law. (*Id.* § III). Thus, for example, if certain charges are allowed by the loan instruments but are not allowed under state law, the FTC Consent Order ***does not*** allow Fairbanks to charge them to consumers in the states that restrict the fees. *Id.* Indeed, the FTC Consent Order explicitly states that "nothing in this Order shall permit the Defendants to impose any fee or take any other action that is prohibited by any state or

4

federal law and/or prohibited by the loan instruments and/or other contractual agreement with the consumer." (*Id.* § VI).

In addition, the FTC Consent Order puts additional restrictions on specific fees for the next five years, even if they are expressly authorized and otherwise would not be prohibited by the FTC Consent Order. (*Id.* § V). This provision prohibits charging borrowers for property inspections, broker's price opinions, or attorneys' fees unless specific requirements are met. Again, to the extent that property inspections, broker's price opinions, or attorneys' fees are not expressly authorized or are prohibited by law, Fairbanks cannot charge for them at all.

Objectors Overbaugh, VanDale, and others represented by Daniel F. Hedges (the "Overbaugh Objectors") seek to convince this Court that the Settlement's injunctive relief should not be approved because it institutionalizes the charging of unnecessary collection fees in the servicing industry, and that the FTC Consent Order effectively "approves" and "blesses" the fees. In addition, Objectors Kimberly Millis Maher and Patrick Maher state that the FTC Consent Order risks institutionalizing the charging of certain foreclosure fees. First, we note that the Court has already approved the FTC Consent Order; the only matter before the Court now is whether the proposed class action settlement should be approved. Indeed, these objectors are not parties to the FTC Consent Order and have no standing to object to it. In any event, the FTC Consent Order imposed strict limitations on certain servicing fees, and the FTC did not "bless" these fees in any way. To the contrary, the FTC Consent Order severely limits the circumstances in which Fairbanks may charge certain fees. Furthermore, neither the FTC Consent Order nor the proposed Settlement allows servicing fees that are prohibited under a consumer's state law. Specifically, the FTC Consent Order states that it does not permit the Defendants to impose any

5

fee or take any other action that is prohibited by any state or federal law. (*Id.* § VI). Therefore, this Court should reject the objectors' contentions that the settlements improperly "institutionalize" certain servicing fees.

Although the Overbaugh Objectors imply that Senators Paul Sarbanes and Barbara Mikulski would object to the FTC settlement, in reality these Senators participated in the FTC's press conference announcing the FTC Consent Decree, issued press releases "congratulating" the FTC and HUD, and called the settlement "a great day" for consumers. *See* Press Releases of Senators Sarbanes and Mikulski (attached as Exhibit 2). Furthermore, the FTC is aware of industry discussion of the Fairbanks settlement; however, this discussion indicates the Fairbanks settlement set a "high bar for policies and business practices of subprime servicers." *See, e.g.,* Joanne Y. Cleaver, *Trouble on the Home Front*, Collections & Credit Risk, Feb. 2004, at 26 (attached as Exhibit 3).

## II.    THE REDRESS PROGRAM

This section of the FTC's submission will describe the Redress Program, specifically: (1) selection of the redress administrator; (2) provision of the notices and claim forms; and (3) the distribution plan. The Commission has consulted with the defendants and class counsel regarding all aspects of the Redress Program, over which it has sole discretion. (FTC Consent Order § XXII).

### A.    The Redress Administrator

The Commission chose Gilardi and Co., LLC, of Larkspur, California ("Gilardi") to administer the Redress Program in this matter. Gilardi is one of two companies under contract with the Commission to handle redress in appropriate cases. As redress administrator in prior

FTC cases for more than twenty years, Gilardi's staff, under the Commission's direction, has located consumer addresses, completed data entry, handled mailings to potential claimants, processed claims, calculated eligible claim amounts, issued redress checks, prepared tax returns and final accountings, and conducted other necessary administrative functions in connection with distributing redress funds.

Pursuant to its contract with the Commission, Gilardi charges the Commission set prices for each task specified in the line-items included in the contract's "Statement of Work." Not all tasks are required for all redress matters assigned under the contract. In addition, those tasks that are required with respect to a particular redress distribution program may not apply to all redress claims in a particular matter. For most specified tasks, pricing is graduated and declines on a per-piece basis.

### B.  The Notification Phase

Gilardi's initial function was to print and mail the Notice of Proposed Class Action Settlement ("Class Notice") and the appropriate claim forms to eligible class members (the "Notification Phase").[3] To identify borrowers in the class, the FTC requested from the defendant the names, addresses, phone numbers, social security numbers, and certain loan information pertaining to all eligible borrowers, pursuant to Section XXIV of the FTC Consent Order. Fairbanks performed a National Change of Address search to update class members' addresses in the data set. Fairbanks then provided the information to the FTC, and the FTC furnished the

---

[3] In addition to the mailing of individual Class Notices, the defendants also published a summary class notice in the national edition of USA Today on two occasions in March 2004. Since February 2004, the Class Notice has also been available on both the FTC's and Gilardi's web sites. The Settlement and the FTC Consent Order have been a matter of public record since November 2003.

information to Gilardi for use in the Redress Program.

Based on the FTC's preliminary review of the information obtained from the defendants' records, the class consists of 747,757 borrower units.[4] Gilardi is also receiving and processing class members' requests for exclusion ("opt-outs") for the Court's consideration. As a result of opt-outs, the FTC anticipates that the final number of borrower units in the class will be lower than the number reflected in the defendants' records.

Gilardi completed the initial mailing of Class Notices to eligible class members on February 24, 2004. Since that time, Gilardi has re-mailed notices that were returned by the post office with updated addresses. It has also mailed the Class Notice to over 4,300 individuals who requested it. For purposes of future mailings, the defendants will provide updated addresses for class members with loans it is currently servicing. In addition, class members have provided, and may continue to provide, updated addresses to Gilardi by U.S. mail or voice mail.

Along with the Class Notice, consumers received up to three claim forms, depending on their individual circumstances. *See* Claim Forms (attached as Exhibit 4). The claim forms were for (1) Late Fees/Default-Related Fees, (2) Prepayment Penalties, and/or (3) Foreclosure, as described in detail below. All three claim forms were made available on the FTC's Web site and through the redress administrator's toll-free number. Class members who are only eligible for the "Reverse and Reimburse" portion of the Settlement did not receive a claim form; there is no claim form for the "Reverse and Reimburse" program.[5]

---

[4]A borrower unit consists of a primary borrower and co-borrower, if any, on one or more eligible loans.

[5]Through the Reverse and Reimburse program, if the Settlement is approved, Fairbanks will reimburse certain charges in full (if previously paid) or reverse such charges (to the extent

The Class Notice and claim forms informed consumers that the amount of money they will receive through the Redress Fund will depend on the amount Fairbanks charged them, less refunds, and the number of borrowers who participate in the Redress Program. In addition, the Class Notice said the FTC expects that the amount of claims will exceed the amount in the Redress Fund, and, in that event, class members will be paid on a pro-rata basis. Also, the Class Notice informed consumers that every class member who was harmed and that files a timely, valid claim will receive at least some distribution from the Redress Fund.

Class members were eligible to receive and submit claim forms in the following three categories:

**(1) Late Fees/Default Related Fees:** Consumers who had been charged for late fees or certain other default related fees received a claim form that specified the amount of such fees Fairbanks had charged them during the applicable time period (minus the amount of any refunds or waivers of those fees as of that date). Default-related charges include fees for property inspections, broker's price opinions, demand letters, interest on advances, foreclosure costs, and attorneys' fees. Class members were instructed to sign and return this claim form if they believed that some (or all) of the late fees or other default-related fees that Fairbanks charged them were improper. The claim form stated that the

---

they remain pending on consumers' accounts without payment). The Reverse or Reimburse Program applies to (1) hazard insurance charges imposed by Fairbanks when the borrower had an existing policy of hazard insurance, as well as "follow on" charges, such as late payment fees and other delinquency-related fees that resulted from the improper insurance charges; (2) tax penalties and/or interest and follow on charges resulting from Fairbanks' failure to make timely tax payments from escrowed funds; (3) property appraisal and inspection fees for broker's price opinions and inspections that were not completed due to reinstatement or payoff; (4) excess interest collected at payoff and not previously refunded; and (5) excess interest collected due to rounding errors.

settlement payment would be a portion of the total amount Fairbanks had charged. Gilardi sent Late Fee/Default Related Fee claim forms to about 670,000 borrower units.

**(2) Prepayment Penalties:** Consumers who had been charged a prepayment penalty during the time period received a claim form that specified the amount of the prepayment penalty charged.[6] Class members were instructed to sign and return the claim form if they believed that the prepayment penalty that Fairbanks charged was unlawful because it was not authorized by their mortgage documents or it was illegal under state law. As the claim form described, consumers could find out if the prepayment penalties were lawful by reviewing the mortgage note and any rider (or addendum) to the note. If consumers did not have their notes or could not find the relevant part of their notes, or if they wanted to find out if their state has any legal restrictions on prepayment penalties, a toll-free number was provided to obtain the information. The claim form explained that if the consumer's claim is accepted, s/he will receive at least $200 (or the amount paid for the prepayment penalty, if it is less than $200). Gilardi sent Prepayment Penalty claim forms to about 110,000 borrower units.

**(3) Foreclosure:** Consumers whose homes had been subject to a completed foreclosure sale received the foreclosure claim form. Class members were instructed to sign and return the claim form if they believed that the foreclosure was improper. As the claim form described, an improper foreclosure was defined as one in which one or more of the

---

[6]A prepayment penalty is a charge imposed on a borrower for paying off or refinancing a loan during a certain time period. The terms of the prepayment penalty are set by the original lender and are described in the mortgage note. Fairbanks, as the servicer, imposed the charge on certain borrowers when they paid off their loans.

following things happened: (a) the consumer tried to make payments, but Fairbanks lost them or refused them; (b) Fairbanks said the consumer owed money that the consumer did not owe and foreclosed because of that; or (c) the consumer tried to sell the property before the foreclosure sale, but Fairbanks did not accept the loan payoff or caused him/her to lose out on the sale for some other reason. The claim form explained that even if the consumer's claim of wrongful foreclosure is accepted, s/he may not receive payment for all of the losses. It stated that consumers who have substantial losses may wish to opt out of the Settlement and bring an individual action. Gilardi sent Foreclosure claim forms to about 58,000 borrower units.[7]

### C.  Distributions Under the Redress Program

#### 1.  Evaluation of Claims

If the Court gives final approval to the Settlement, Gilardi's next function will be to evaluate the claims received and determine the redress amount due each eligible class member, pursuant to the Commission's instructions (the "Evaluation Phase"). As set forth in the Class Notice, the Commission plans to divide the redress fund into two components.[8] One component,

---

[7]The Overbaugh Objectors contend that the proposed Settlement is unfair because it relies on a confusing claims process to determine compensation to borrowers. Yet they do not point to any specific part of the claim forms to support their claim that the process is confusing. In fact, each claim form simply provides a signature line for borrowers to sign if they would like to make a claim; there are no complicated check boxes or unnecessary questions on the forms. *See* Claim Forms (attached as Exhibit 4). Courts routinely approve settlements that require claim forms to obtain benefits. Moreover, as of the date of this filing, over 236,000 borrowers have submitted claim forms; this large number underscores the fact that the claims process is simple and understandable.

[8]This is a general description of the distribution plan and does not address all details of the plan.

11

which we estimate will consist of $35 million, will be used for settlement payments for improper fees and prepayment penalties. First, the FTC will provide at least $200 to each class member who makes a valid claim for an unlawful prepayment penalty (or the amount paid for the prepayment penalty, if it is less than $200). Then, the FTC plans to use the remaining money in the $35 million fund for redress related to late and other default-related fees. Class members will be eligible to receive money from the Redress Fund in proportion to the amount of money in late fees and certain other default-related fees that they paid or were assessed (less any refunds received).[9] These fees will not include costs that will be separately reimbursed through the Reverse or Reimburse Program. The FTC proposes to calculate redress for default-related fees in this manner because it provides a straightforward basis for an equitable distribution of the settlement fund to consumers, and will not impose undue administrative costs and burdens upon the fund and the redress administrator.

The Overbaugh Objectors incorrectly state that West Virginia borrowers will receive less favorable treatment than other class members nationally. To the contrary, if the Settlement receives final approval, the FTC plans to distribute a major portion of the Redress Fund to borrowers nationally based on late fees and certain default-related fees charged by Fairbanks through December 10, 2003, less refunds of those fees. Thus, if any borrower has received a refund of late charges or certain other default-related charges before the date of the distribution, that borrower's refund will be adjusted accordingly. West Virginia class members will be able to participate in this part of the Redress Program on the same basis as any other class members.

---

[9]The refunds considered will include refunds for late fees and other default-related fees that were made pursuant to any other settlements, such as Fairbanks' settlement with the Commissioner of Financial Regulation of the State of Maryland.

Furthermore, they will participate in the prepayment penalty and foreclosure parts of the Redress Fund in the same way as other borrowers nationwide.[10]

The FTC also plans to distribute about $5 million to consumers who lost their homes to foreclosure as a result of alleged improper loan servicing conduct by Fairbanks. The FTC plans to divide the $5 million equally among all consumers who make valid claims for improper foreclosures. As a general rule, consumers in this group are also eligible to benefit from the $35 million fund for default fees, described above. Certain individual consumers, including those who have lost their homes to foreclosure, have filed objections to the proposed settlement, generally on the ground that the relief in the proposed class action settlement does not fully compensate the injury that Fairbanks caused them. The FTC notes that no nationwide settlement addresses each individual consumer's situation, and for that reason, individuals had the right to opt out of the class action if they did not believe the settlement would address their circumstances adequately. Class members who participate in the Settlement will obtain some relief simply by filling out the appropriate claim form(s); their individual claims will not be subject to further review, cross examination, or any defenses that otherwise might be available to Fairbanks in an individual action. In addition, Fairbanks has instituted significant practice changes that seek to prevent future law violations, and borrowers may raise claims based upon

---

[10]The Overbaugh Objectors argue that the West Virginia class certified in *Lucas* should be carved out from the *Curry* release. Although their counsel had ample opportunity to negotiate a carve out of the *Lucas* class, he did not. Moreover, the West Virginia class members are eligible for benefits from the *Curry* settlement in addition to those being received through the *Lucas* settlement: a pro rata reimbursement for any late fees, improper prepayment penalties, and injury related to improper foreclosures, as well as the benefits of the Reverse and Reimburse Program. Thus, the FTC believes it is fair and reasonable that West Virginia borrowers be given the same opportunity to benefit from this Settlement as other class members.

the Settlement's Default Resolution Program or the Operational Practices as defenses to individual foreclosures.

### 2. The Payment Phase

If the Court approves the Settlement, Gilardi will mail checks to class members, along with a cover letter and perhaps a brief FTC consumer education piece, such as a bookmark or postcard (the "Payment Phase"). Gilardi will mail replacement checks, as needed, and make any subsequent distributions to eligible class members from the Redress Fund. In addition, Gilardi will be required to perform other administrative functions, including establishing and maintaining bank accounts and appropriate business records; obtaining and maintaining insurance; preparing and filing required tax records; and preparing a final accounting. Performance standards under the contract are designed to ensure that the maximum amount of redress funds will be distributed to class members as expeditiously as possible, and the Redress Program will be concluded as soon as possible.

### 3. Payment of Administrative Expenses and Taxes

As provided in the FTC Consent Order, Fairbanks paid for the Notification Phase of the Redress Program, and the Commission will pay out of the Redress Fund Gilardi's remaining costs and expenses in administering the Redress Program, including taxes on the redress account.[11] The Commission estimates that these expenses will be no more than $2 million, and perhaps significantly less.

---

[11]Fairbanks will pay the cost of processing requests for exclusions from the class. (FTC Consent Order § XXI).

### 4. Treatment of Any Surplus

Although the amounts proposed to be paid to eligible class members are expected to exceed the amount available for redress, there may still be a surplus after required payments are made. In the FTC's experience, a surplus may occur if class members fail to cash their redress checks or further distributions are not economically feasible. In the event that the Redress Fund is left with a surplus, the FTC may, pursuant to Paragraph XVI of the FTC Consent Order, apply any surplus for such other equitable relief, including consumer education remedies, as the Commission determines to be reasonably related to Fairbanks' practices alleged in the FTC complaint. Any surplus not used for such equitable relief shall be disgorged to the United States Treasury.

## III. CONCLUSION

Commission counsel intends to appear at the fairness hearing on May 12, 2004, and will be available to address any questions that the Court might have.

Dated: May 3, 2004

Respectfully submitted,

WILLIAM E. KOVACIC
General Counsel

Lucy E. Morris
Allison I. Brown
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3224 (phone)
(202) 326-3768 (facsimile)

# CERTIFICATE OF SERVICE

On May 3, 2004, I served true and correct copies of the foregoing **Federal Trade Commission's Memorandum Regarding the Fairbanks Settlement and Redress Program** by causing it to be sent by U.S. mail, first class, postage pre-paid, from Washington, DC, to the following:

Gary Klein
John Roddy
Grant, Klein & Roddy
727 Atlantic Ave., 2nd floor
Boston, MA 02111

Niall P. McCarthy
Cotchett, Pitre, Simon & McCarthy
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010

Thomas M. Hefferon
Goodwin Procter, LLP
1717 Pennsylvania Ave., NW
Washington, DC 20006

Kelly M. Dermody
Lieff, Cabraser, Heimann & Bernstein LLP
275 Battery Street, 30th floor
San Francisco, CA 94111

Daniel Mulligan
Jenkins & Mulligan
660 Market Street, 3rd floor
San Francisco, CA 94104


_____
Allison I. Brown